ERIN E. WILK (Cal. Bar No. 310214)
Email: wilke@sec.gov
MADIHA M. ZUBERI (Cal. Bar No. 326962)
Email: zuberim@sec.gov
DAVID ZHOU (NY Bar No. 4926523)
Email: zhoud@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Monique C. Winkler, Regional Director
Jason H. Lee, Associate Regional Director
44 Montgomery Street, Suite 700
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:24-cv-7967 |
| Plaintiff, | COMPLAINT |
| vs. | |
| RARI CAPITAL, INC.; JAI BHAVNANI; JACK LIPSTONE; and DAVID LUCID, | |
| Defendants. | |

In support of its Complaint against Defendants Rari Capital, Inc. ("Rari Capital"), Jai Bhavnani, Jack Lipstone, and David Lucid, Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78(u)(e), and 78aa].

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce in connection with the acts, practices, and courses of business alleged in this Complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendants Bhavnani and Lipstone reside in this district.

## SUMMARY

4.      In 2020, Bhavnani, Lipstone, and Lucid (together the "co-founders") created Rari Capital (together with the co-founders, "Defendants") and began developing Rari Capital's protocol, a so-called decentralized finance ("DeFi") project that provided financial services on the Ethereum blockchain and utilized blockchain-based smart contracts (*i.e.*, programs run on a blockchain) to facilitate investment opportunities for investors. As part of the protocol, the co-founders developed two primary investment products called Earn pools and Fuse pools (together, the "Rari protocol").

5.      This Complaint details multiple violations of the federal securities laws that stemmed from Defendants' creation and operation of the Earn pools and Fuse pools. First, Rari Capital violated Sections 5(a) and 5(c) of the Securities Act because it offered and sold securities in the form of interests in the Earn pools (represented by a crypto assets in the form of ERC-20 tokens that had various names including the "Rari Fund Token"), purported governance crypto assets called Rari Governance Tokens ("RGT"), and interests in the Fuse pools (represented by a crypto asset called the "fToken") without registering any of those offers and sales and without qualifying for any exemptions from such registration requirements. Second, Defendants violated Section 17(a)(3) of the Securities Act, and Rari Capital, Bhavnani, and Lipstone also violated Section 17(a)(2) of the Securities Act, by making materially false and misleading representations about the Earn product to investors. Third, Defendants violated Section 15(a) of the Exchange Act by engaging in unregistered broker activity in connection with the Fuse pools.

6.      The Earn product, which first began receiving investor deposits in or around July 2020, functioned like a crypto asset investment fund where investors deposited crypto assets into initially one investment pool and Rari Capital then deployed the pooled assets into investment opportunities at third-party crypto asset lending platforms to seek returns for investors (referred to as "yield farming" in the DeFi community). After the Earn product's initial release, Defendants created additional investment pools with varying risk profiles and continued to expand investment opportunities for these pools. In return for their investment in an Earn pool, investors received ERC-20 tokens, such as Rari Fund Tokens, that could be traded on secondary crypto asset trading platforms, and that represented their pro rata shares of the pool's assets and through which they earned a pro rata share of the interest earned by the pool. For a limited period, Earn pool investors also received a distribution of RGT, Rari Capital's purported

governance crypto asset. At its height, investors invested at least $95 million of crypto assets into Rari Capital's Earn product. Rari Capital publicly advertised interests in the Earn pools and the RGT distribution, both of which were investment contracts and therefore securities, but did not register those offers and sales with the SEC even though there were no applicable exemptions from registration.

7.     Defendants also made material misstatements to investors, falsely claiming that the Earn pools, through a Rari Capital developed smart-contract mechanism called the "Yield Aggregator," automatically and autonomously rebalanced pool assets between investment opportunities in search of the highest yields. Although Rari Capital scripted the Yield Aggregator to automatically and autonomously rebalance assets, in practice the Yield Aggregator often failed to operate and required manual prompting from Rari Capital employees to run its rebalancing mechanism. Additionally, Defendants materially misled investors by touting high interest rate returns of the Earn pools without factoring in the fees charged by Rari Capital and other transaction costs, which significantly reduced the returns paid to investors. About a third of investors in the Earn pools lost money because blockchain transaction fees and other platform fees exceeded any returns on their investments.

8.     In or around March 2021, Defendants released what became Rari Capital's most popular product, the borrowing and lending platform called Fuse, which at its height held crypto assets worth at least $1 billion USD. The Fuse platform allowed individual users (or pool creators) to create unique pools to facilitate the lending and borrowing of crypto assets, including crypto assets offered and sold as securities. The Fuse pools were based on a set of smart contracts developed and controlled by Defendants that were deployed and run on the Ethereum blockchain. Defendants also provided a front-end user interface that allowed users to interact with the platform. Investors deposited crypto assets into

specific pools and received an fToken, tradeable on secondary crypto asset trading platforms, representing their pro rata interests in those pools' assets and through which they earned their pro rata interests in those pools' earnings. A portion of that paid interest was also allocated to the Rari protocol as a performance fee, with the remainder going to investors on a pro rata basis. The interest earned by investors depended on the underlying pool of assets and how much that pool had generated by lending its crypto assets. Rari Capital advertised Fuse's services through Rari Capital's public website, social media channels, and direct communications, but did not register the offer or sale of interests in the Fuse pools, which constituted investment contracts and thus securities, with the SEC even though there were no applicable exemptions from registration.

9.      Defendants also operated as unregistered brokers through the Fuse platform, which engaged in transactions for the accounts of Fuse users involving certain crypto assets offered and sold as securities, including MATIC, LINK, FTM, UST, and RGT. The underlying smart contracts, which, as noted above, were developed and controlled by Defendants through at least early 2022, received transaction instructions from users to move crypto assets offered and sold as securities into and out of certain Fuse pools, and the smart contracts developed and controlled by Defendants carried out those instructions. Defendants also created and administered several of the larger Fuse pools, one of which included at least one crypto asset offered and sold as a security. In addition, the Rari Capital team programmed the Fuse platform to assign a letter-graded "Rari Safety Score" to the Fuse pools based on a risk assessment of each pool. Defendants generated revenue for the Rari protocol by charging a performance-based fee of approximately 10 percent of the interest earned from depositing and borrowing activity in each pool.

10.     Ultimately, operations of the Fuse platform were suspended after an unknown third party was able to drain over $80 million of users' crypto assets

from pools connected to the platform through an exploit of a design vulnerability in the smart contracts' coding.

11.    The SEC seeks Final Judgments that: (a) permanently enjoin Defendants from violating the federal securities laws and rules set forth in this Complaint; (b) permanently enjoin Rari Capital from participating in the issuance, purchase, offer, or sale of any securities; (c) permanently enjoin Bhavnani, Lipstone, and Lucid from participating in the issuance, purchase, offer, or sale of any crypto assets offered and sold as securities; (d) order Bhavnani, Lipstone, and Lucid to disgorge all ill-gotten gains they received as a result of the alleged violations pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), (d)(3), and (d)(7)], and to pay prejudgment interest thereon; (e) order Bhavnani, Lipstone, and Lucid to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (f) order Bhavnani, Lipstone, and Lucid barred from serving as an officer or director of a public securities issuer pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## **DEFENDANTS**

12.    **Rari Capital**, **Inc.** is a Delaware corporation created in June 2020 by Bhavnani, Lipstone, and Lucid. Rari Capital's operations were principally based in Los Angeles, California. Rari Capital was the relevant legal entity listed in the Terms of Service for the user interface facilitating the Earn and Fuse platforms. Rari Capital has never been registered with the SEC in any capacity and has never had any securities registered with the SEC.

13.    **Jai Bhavnani**, currently age 22, resides in Los Angeles, California. Bhavnani co-founded Rari Capital and served as the company's Chief Executive Officer. Since Rari Capital's inception, Bhavnani was responsible for key decision making and investor communications, and was involved in marketing

efforts for the Rari protocol. Bhavnani has never been registered with the SEC in any capacity or associated with any registered broker-dealers.

14.    **Jack Lipstone**, currently age 23, resides in Los Angeles, California. Lipstone co-founded Rari Capital and served as the company's Chief Operating Officer. Lipstone was largely responsible for business development, marketing efforts, and community management for the Rari protocol. Lipstone has never been registered with the SEC in any capacity or associated with any registered broker-dealers.

15.    **David Lucid**, currently age 23, resides in Austin, Texas. Lucid co-founded Rari Capital and served as the company's Chief Technology Officer. Lucid was primarily responsible for developing the smart contracts underlying the Rari protocol. Lucid has never been registered with the SEC in any capacity or associated with any registered broker-dealers.

## RELATED ENTITY

16.    **Rari Capital Infrastructure LLC** ("Rari Capital Infrastructure") is a Delaware limited liability company that was formed in March 2022 to facilitate development of, among other things, the Fuse platform, following a leadership change within the Rari protocol. Rari Capital Infrastructure thereafter wound down operations of the Rari protocol after an exploit of the Fuse platform in May 2022 resulted in the loss of over $80 million of investors' assets. Rari Capital Infrastructure has never been registered with the SEC in any capacity and has never had any securities registered with the SEC.

## BACKGROUND ON CRYPTO ASSETS

17.    The term "crypto asset" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets

sometimes referred to as "cryptocurrencies," "digital assets," "virtual currencies," "digital coins," and "digital tokens."

18.     A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." The system relies on cryptographic techniques for secure recording of transactions.

19.     A blockchain "protocol" is a code, software, or algorithm that governs how a blockchain, or a feature of a blockchain, operates.

20.     A "wallet" is a piece of hardware or software on which crypto asset owners typically store the cryptographic key information providing them control over their crypto assets. Crypto wallets offer a method to store and manage critical information about crypto assets, *i.e.*, cryptographic information necessary to identify and transfer those assets.

21.     A "smart contract" is a software or code that, based on programmable conditions, is deployed and run on a blockchain.

22.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report were offered and sold as investment contracts and, thus, securities.

## FACTUAL ALLEGATIONS

**A.     Rari Capital Engaged in the Unregistered Offer and Sale of Interests in the Earn Pools and RGT as Securities**

   ***i.     Interests in the Earn Pools***

23.     In 2020, Defendants began developing the Earn product, which was the first investment product for the Rari protocol. Earn functioned like a crypto asset investment fund that utilized blockchain-based smart contracts and other

coding to receive and deploy investors' assets. Rari Capital's initial public advertisements described the Earn product as a "website where you can deposit your crypto-assets and we will automatically rebalance it into the highest-yielding stable opportunities."

24.    Defendants released one Earn pool in July 2020, and then released an updated version of the product in October 2020 that expanded the offering to three investment pools with varying risk profiles. However, all the Earn pools operated in the same way. Rari Capital developed a smart-contract mechanism for the Earn pools, referred to as the Yield Aggregator, that purported to move new investor assets into investment opportunities and rebalance existing pools of assets among different third-party investment opportunities to maximize returns. Defendants claimed that the Yield Aggregator performed this movement of assets and rebalancing automatically and autonomously. The investment opportunities consisted primarily of investments into third-party crypto asset lending platforms. Based on an algorithm run through computer code, the Yield Aggregator purportedly would determine whether it was economical to move invested assets into other investment opportunities. Over time, the co-founders, at times with input from the community of users or supporters, expanded the options for the third-party platforms to which the Earn pools, through the Yield Aggregator, could deploy investors' assets.

25.    In return for depositing crypto assets into an Earn pool, investors received an ERC-20 token, initially the Rari Fund Token, tradeable on secondary crypto asset trading platforms, that represented each investor's interest in the specific investment pool and right to any profits that were shared pro rata with other token holders.

26.    Rari Capital disclosed that the Rari protocol charged investors a withdrawal fee. In addition, Rari Capital disclosed that it charged a performance fee on Earn pool profits that was originally 20% and was later updated to 9.5% of

such profits. The fees, paid in crypto assets, were stored in the Rari protocol. A
portion of such fees were distributed to wallets controlled by the co-founders and
others to support further protocol development and cover expenses, including one
wallet, known as the Rari Capital Treasury, that received approximately $370,000
in fees from the Earn pools between July 2020 and September 2021.

27.    Rari Capital marketed interests in the Earn pools to investors through
direct communications with investors, a public website for Rari Capital, public
interviews, and through social media channels including Twitter, Telegram,
Discord, and Medium, among others. Rari Capital advertised the pools' ability to
maximize yield for investors and make investing in DeFi easy for anyone. Rari
Capital further publicly advertised the annual percentage yield, or "APY," for the
Earn pools, often highlighting particularly high APYs on social media platforms
such as Twitter.

28.    An investor's purchase of an interest in these opportunities—which
occurred by the investor depositing money, in the form of crypto assets, into an
Earn pool and receiving a token that evidenced the investor's interest in the pool
and a right to receive a pro rata share of the interest earned through the pool's
activity—constituted the offer and sale of investment contracts and thus securities.

29.    Investors in the Earn product invested in a common enterprise with
other investors and with Rari Capital. After directing the crypto assets into the
pools, the investors no longer controlled those assets. Investors' crypto assets
were then pooled by the smart contracts. Investors depended on Rari Capital to
develop algorithms, smart contracts, and downstream lending opportunities to
invest their assets for a return, as well as the efforts of Rari Capital and the co-
founders to further improve the Earn product, including by generating better
investment opportunities. For example, an Earn pool's annual percentage yield
depended on both the Yield Aggregator's ability to invest and rebalance the assets
in that pool into higher yield generating investment opportunities, and the Rari

Capital team's ability to create more investment strategies with higher returns. Because Rari Capital did not segregate the pooled assets by investor (but only by type of crypto asset), each investor's fortunes were tied to the fortunes of other investors, and each investor profited or suffered losses equally and in proportion to their pro rata investments in the Earn pools. In addition, because Rari Capital directly shared in the returns investors made by receiving performance fees on Earn pool profits, the Earn pool investors' fortunes were also linked to those of Rari Capital. As stated on Rari Capital's website in or around October 2020, "[t]he more money you make, the more money we make."

30.    Through its public statements, and given the economic reality of the Earn pools, Rari Capital invited Earn pool investors to reasonably expect that they would earn profits derived from the efforts of Rari Capital and others.

## ii.    RGT

31.    In October 2020, in conjunction with the expansion of the Earn product to three investment pools, Rari Capital launched a so-called "liquidity mining" program that offered RGT to investors who invested crypto assets in one or more of the Earn pools during a 60-day period. The program was intended to encourage new and existing investors to make investments in the Earn pools. Investors also continued to receive Rari Fund Tokens as well as other ERC-20 tokens. Under the program, Rari Capital planned to release 87.5% of the RGT to investors in the Earn pools and retain 12.5% of the tokens to compensate the Rari Capital team, as well as certain advisors to Rari Capital.

32.    Prior to the October 2020 launch, as part of the RGT distribution, Rari Capital offered a "Launch Partner Program" to solicit commitments of at least $100,000 USD to invest in the Earn pools from venture capital firms and other high net-worth investors. In return, investors would receive pro rata interests in the profits of the Earn pools and a proportional distribution of RGT. Rari Capital sent emails to investors and potential investors explaining that their

investments would start generating returns right away because their crypto assets would be invested by the Yield Aggregator, and because the investors would receive RGT. The Launch Partner Program functioned to guarantee revenues, from withdrawal fees and performance fees, that Rari Capital and its co-founders could use to continue developing and growing the Rari protocol, and also enabled Rari Capital to use RGT to fund its additional growth. Indeed, Rari Capital retained 12.5% of the RGT to use as compensation and benefited, together with investors, from any increases to RGT's price.

33.    As with the Earn pools, Rari Capital marketed RGT as an investment opportunity into its efforts to grow the Rari Capital platform. RGT purported to give holders the ability to vote on certain governance decisions affecting the Earn pools, such as upgrades to the protocol and changes to fees. However, Rari Capital invited RGT investors to expect RGT to increase in value based on Rari Capital's efforts to develop and increase usage of the Rari Capital platform, and the expectation that RGT would be tradeable on secondary crypto asset trading platforms. Although RGT did not entitle holders to pro rata shares of the Earn pool profits, Rari Capital publicly explained that 70% of the fees earned from the Earn pools would be used to buy back and burn RGT, and one of Rari Capital's public posts on Medium explained that RGT "will be burned on every cent made by the protocol . . . decreasing the total supply of the token as the protocol succeeds." According to Rari Capital, a declining supply of RGT would cause the price of RGT in the secondary market to increase to the benefit of RGT holders and investors. Investors shared proportionally in any increases in RGT's value because the amounts of RGT they received were proportional to the amounts they invested in the Earn pools. Furthermore, Rari Capital made clear to investors that it was working to develop the secondary trading market for RGT through efforts to make RGT available for trading on secondary crypto asset trading platforms.

34.     RGT was offered and sold as an investment contract. Investors who invested in RGT expected the value of RGT to increase based on the efforts of Rari Capital and others.

### iii.    *Rari Capital Failed to Register the Offer and Sale of Interests in the Earn Product and RGT with the SEC*

35.     Rari Capital made use of various means and instrumentalities of interstate commerce to offer and sell interests in the Earn pools and distribute RGT by, among other things, engaging in general solicitation through the Rari Capital website and through social media channels. Rari Capital was also involved in many direct communications with investors, including through email, Telegram, and telephone calls.

36.     Rari Capital never filed a registration statement with the SEC for its offers and sales of interests in the Earn pools and RGT. No exemption from registration applied.

37.     In total, investors invested crypto assets worth millions of dollars in the Earn pools through approximately 1,900 unique addresses.

38.     Defendants transferred approximately $370,000 in Earn pool fees to the Rari Capital Treasury. The co-founders, in turn, took payments from the crypto assets in the Rari Capital Treasury, primarily to reimburse them for certain costs incurred in starting Rari Capital.

39.     With respect to RGT, Rari Capital initially minted approximately 10 million RGT, with a reserve of 12.5% for the Rari Capital team, but all of which was eventually distributed to users of the Earn pools. RGT was available for trading on numerous secondary crypto asset trading platforms, including Binance, Coinbase, and Uniswap.

**B.    Defendants Materially Misrepresented the Operations of the Earn Pool Product**

40.    Defendants claimed to investors that a key feature of the Earn pools was that they were balanced by the Yield Aggregator, a set of blockchain-based smart contracts and programming that operated autonomously and continuously to move invested assets into investment opportunities, and rebalance those assets among investment opportunities to obtain the advertised returns for investors. Accordingly, Rari Capital, Bhavnani, and Lipstone specifically marketed the Earn pools as functioning "automatically" and "autonomously."

41.    Although Rari Capital scripted the Yield Aggregator to automatically and autonomously rebalance assets, in practice the rebalancing mechanism often failed to operate at all and required manual input from the Rari Capital team, such as from Lucid, to run the rebalancer code. There were multiple times when the rebalancing mechanism failed and the Rari Capital team did not immediately manually run the rebalancer code, and, as a result, as one example, the rebalancing occurred days after the deposit of investor assets. Contrary to the false and misleading representations in Defendants' marketing materials, investor assets in the Earn pools were not always automatically or continuously rebalanced into higher-yielding strategies. Moreover, by manually turning on the Yield Aggregator when the rebalancing mechanism failed, Defendants created the false and misleading impression that the Yield Aggregator did in fact operate on its own at all times. The misrepresentations about the rebalancing mechanism of the Earn pools were material to investors in the Earn pools because a reasonable investor would consider the operation of the rebalancing mechanism an important fact in evaluating the performance of the Earn pools and considering a potential investment.

42.    In addition, Rari Capital's marketing materials sometimes misleadingly touted the high APYs of the Earn pools without factoring in the

impact of the fees collected by Rari Capital and other costs. Those fees and costs

had the effect of significantly reducing the actual returns paid to investors. Indeed,

approximately 33% of investors lost money on their investments in the Earn pools

as a result of the Rari Capital fees and other costs that investors incurred. These

misleading statements about the supposedly high APYs of the Earn pools were

material to investors in the Earn pools.

**C.    Rari Capital Engaged in the Unregistered Offer and Sale of Interests in
the Fuse Pools, Which Were Offered and Sold as Securities**

43.    Defendants created and launched the Fuse platform in March 2021.

The Fuse platform allowed individual users to create unique pools to facilitate the

depositing and borrowing of crypto assets, including crypto assets offered and

sold as securities. The Fuse platform enabled pool creators to customize the

depositing and borrowing parameters for the pools, such as the types of crypto

assets that could be deposited and lent, fee amounts, interest rate curves, and

collateral requirements. After creating a pool on the Fuse platform, the pool

creator had the option of retaining administrator rights to alter the parameters for

the given pool, sometimes referred to as a "liquidity pool."

44.    The Fuse platform was based on a set of smart contracts developed

by Defendants and others on the Rari Capital team that were deployed and run on

the Ethereum blockchain, and that owned the crypto assets deposited by investors.

Defendants also developed and provided a web-based user interface that enabled

users to access and interact with the smart contracts underlying the Fuse platform.

Through the Fuse platform, users could either deposit crypto assets into a pool

and earn their respective share of interest on lending and borrowing activity in

that pool, or, after depositing crypto assets as collateral, borrow from a pool by

withdrawing other crypto assets. In each specific Fuse pool, the smart contracts

pooled together the crypto assets deposited by investors of that pool and made

those crypto assets available for borrowing. Users who borrowed crypto assets

paid interest, which funded returns to the investors who deposited the crypto assets in the pool. Investors who deposited the crypto assets received an fToken, an ERC-20 token tradeable on secondary crypto asset trading platforms, that evidenced their interest in their specific Fuse pool and their right to receive a pro rata share of the pool's interest earnings.

45.    Through the smart contracts developed by Defendants, Fuse received depositing and borrowing transaction instructions from users and executed those instructions, if the conditions for such requests were met within a given Fuse pool. Defendants, through permissions programmed into the Fuse platform's smart contracts, maintained the ability to shut down the platform, replace the platform's underlying smart contracts, and revoke the pool creators' administrator rights.

46.    Through Rari Capital's public website, social media channels, and direct communications, Rari Capital solicited users to deposit crypto assets into and borrow crypto assets from the pools on the Fuse platform. Rari Capital also promoted Fuse and specific Fuse pools by touting the purportedly high APYs associated with certain pools.

47.    Based on the facts set forth above, an investor's purchase of an interest in these opportunities—which occurred by the investor depositing money, in the form of crypto assets, into a Fuse pool and receiving a token that evidenced the investor's interest in the pool and a right to receive a pro rata share of the interest earned through the pool's activity—constituted the offer and sale of investment contracts and thus securities.

48.    Investors tendered money, in the form of crypto assets, to the Fuse platform to participate in the Fuse pools. Investors' crypto assets were then pooled by smart contracts and were made available for borrowing. Users who borrowed crypto assets paid interest to the pools they borrowed from. A portion of those interest payments, in turn, constituted the returns that were paid to Fuse pool investors who had deposited their crypto assets in the pools, while another portion

of the interest payments was earned by the Rari protocol in the form of performance fees. The returns earned by Fuse pool investors arose from the activities of the pools, which were facilitated by the smart contracts, in lending the crypto assets and receiving interest from that lending activity. In this way, each pool investor's fortunes were tied to the fortunes of the pool's other investors. In addition, because Rari Capital received some of the interest paid by borrowers to the Rari protocol, the Fuse pool investors' fortunes were also linked to those of Rari Capital.

49.     Through its public statements and the economic structure of the Fuse pools, Rari Capital invited Fuse pool investors to reasonably expect that they would earn profits derived from the efforts of Rari Capital and others.

50.     Rari Capital made use of various means and instrumentalities of interstate commerce to offer and sell interests in the Fuse pools by, among other things, engaging in general solicitation through the Rari Capital website and through social media channels. Rari Capital was also involved in many direct communications with investors, including through email, Telegram, and telephone calls, to offer and sell the Fuse pool interests.

51.     Rari Capital never filed a registration statement with the SEC for its offers and sales of interests in the Fuse pools. No exemption from registration applied.

**D.    Defendants Acted as Unregistered Brokers**

52.     For the pools to function, Fuse, through the smart contracts created by Defendants, received depositing and borrowing transaction instructions from users and carried out those instructions, if the conditions for such requests were met within a given Fuse pool. Some of the transactions that Fuse effected for the accounts of its users involved certain crypto assets offered and sold as investment contracts, as defined by the Supreme Court case *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and thus securities.

53.     Through Rari Capital's public website, social media channels, and direct communications, Defendants solicited users to deposit crypto assets into, and borrow crypto assets from, the pools on the Fuse platform. Defendants also promoted Fuse and specific Fuse pools by touting the purportedly high APYs associated with certain pools.

54.     In addition, Defendants engaged in certain services to support and encourage depositing and borrowing on the Fuse platform. For example, the Rari Capital team programmed the Fuse platform to assign a "Rari Safety Score," graded from A to F, to each Fuse pool that purported to provide a risk assessment of each pool. Fuse users could view these "Rari Safety Scores" on both the platform's user interface and Rari Capital's website. Defendants also created and administered several of the larger Fuse pools.

55.     For these services, the Rari protocol charged a performance-based fee of approximately 10 percent on the interest earned in each Fuse pool. Interest earned in each pool depended on the interest rate curve selected by the pool creator and fluctuated based on the depositing and borrowing transactions within the pool. A smart contract developed by Defendants automatically calculated these fees, and once accrued, Defendants maintained the authority to collect them. Defendants at times exercised this authority.

56.     Defendants were never associated with a broker and never registered as brokers with the SEC, and did not operate pursuant to any exception or exemption from registration.

57.     Starting in December 2021, the co-founders of Rari Capital took less active roles in developing the Fuse platform. In March 2022, certain individuals created Rari Capital Infrastructure LLC separately from Rari Capital and its co-founders to operate and further develop the Fuse platform. This change in leadership was announced in June 2022. Rari Capital Infrastructure continued to

solicit users over the internet to lend and borrow crypto assets on the Fuse
platform.

58.    At Fuse's peak, the smart contracts for the Fuse platform held crypto
assets purportedly having a market value of at least $1 billion. Over the life of the
Fuse platform, approximately 180 Fuse pools were created and over 10,000 users
used the platform at one time or another.

## FIRST CLAIM FOR RELIEF

### (Violations of Securities Act Sections 5(a) and 5(c) against Rari Capital)

59.    The SEC realleges and incorporates by reference Paragraphs 1
through 58 as if fully set forth herein.

60.    By engaging in the conduct described above, Defendant Rari Capital,
directly or indirectly, made use of the means or instruments of transportation or
communication in interstate commerce, or of the mails, to offer to sell or to sell
securities through the use or medium of any prospectus or otherwise, or carried or
caused to be carried through the mails or in interstate commerce, by means or
instruments of transportation, securities for the purpose of sale or for delivery
after sale, when no registration statement had been filed or was in effect as to such
securities, and when no exemption from registration was applicable.

61.    By engaging in the conduct described above, Defendant Rari Capital
has violated and, unless restrained and enjoined, will continue to violate Securities
Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) & 77e(c)].

## SECOND CLAIM FOR RELIEF

### (Violations of Securities Act Section 17(a)(2) against Rari Capital, Bhavnani, and Lipstone)

62.    The SEC realleges and incorporates by reference Paragraphs 1
through 58 as if fully set forth herein.

63.    Defendants Rari Capital, Bhavnani, and Lipstone, by engaging in the
conduct described above, directly or indirectly, in the offer or sale of securities,

by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64. By reason of the foregoing, Defendants Rari Capital, Bhavnani, and Lipstone violated and, unless restrained and enjoined, will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF

**(Violations of Securities Act Section 17(a)(3) against Rari Capital, Bhavnani, Lipstone, and Lucid)**

65. The SEC realleges and incorporates by reference Paragraphs 1 through 58 as if fully set forth herein.

66. Defendants Rari Capital, Bhavnani, Lipstone, and Lucid, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

67. By reason of the foregoing, Defendants Rari Capital, Bhavnani, Lipstone, and Lucid violated and, unless restrained and enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**FOURTH CLAIM FOR RELIEF**

**(Violations of Exchange Act Section 15(a) against Rari Capital, Bhavnani, Lipstone, and Lucid)**

68.     The SEC realleges and incorporates by reference Paragraphs 1 through 58 as if fully set forth herein.

69.     At all relevant times, by engaging in the conduct described above, Defendants Rari Capital, Bhavnani, Lipstone, and Lucid, and each of them, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without registering with the SEC as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)], and without complying with any exemptions promulgated pursuant to Section 15(a)(2) of the Exchange Act [15 U.S.C. § 78o(a)(2)].

70.     By engaging in the conduct described above, Defendants Rari Capital, Bhavnani, Lipstone, and Lucid, directly or indirectly, violated and, unless restrained and enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter Final Judgments:

(a)     Permanently enjoining Defendant Rari Capital, and those persons in active concert or participation with it, who receive actual notice of the judgments by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(2), and 77q(a)(3)] and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(b)     Permanently enjoining Defendants Bhavnani and Lipstone, and those persons in active concert or participation with each of them, who receive actual

notice of the judgments by personal service or otherwise, and each of them, from violating Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)] and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(c)    Permanently enjoining Defendant Lucid, and those persons in active concert or participation with him, who receive actual notice of the judgments by personal service or otherwise, and each of them, from violating Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)] and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(d)    Permanently enjoining Defendant Rari Capital from directly or indirectly, including, but not limited to, through any entity owned or controlled by Rari Capital, participating in the issuance, purchase, offer, or sale of any securities;

(e)    Permanently enjoining Defendants Bhavnani, Lipstone, and Lucid from directly or indirectly, including, but not limited to, through any entity owned or controlled by Bhavnani, Lipstone, or Lucid, participating in the issuance, purchase, offer, or sale of any crypto assets offered and sold as securities; provided however, that such injunction shall not prevent Bhavnani, Lipstone, and Lucid from purchasing or selling securities for their own personal accounts;

(f)    Ordering that Defendants Bhavnani, Lipstone, and Lucid be barred from serving as an officer or director of a public issuer pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

(g)    Ordering Defendants Bhavnani, Lipstone, and Lucid to disgorge all ill-gotten gains received as a result of their unlawful conduct plus prejudgment interest thereon pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

1    (h)    Ordering Defendants Bhavnani, Lipstone, and Lucid to pay civil

2    penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

3    Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

4    (i)    Retaining jurisdiction of this action in accordance with the principles

5    of equity and the Federal Rules of Civil Procedure in order to implement and

6    carry out the terms of all orders and decrees that may be entered, or to entertain

7    any suitable application or motion for additional relief within the jurisdiction of

8    this Court; and

9    (j)    Granting such other relief to the SEC as the Court may deem just and

10    proper.

11

12    Dated:  September 18, 2024              */s/ Madiha M. Zuberi*
                                              MADIHA M. ZUBERI
13                                            ERIN E. WILK
                                              *Attorneys for Plaintiff*
14                                            Securities and Exchange Commission

15

16

17

18

19

20

21

22

23

24

25

26

27

28